## THE JOSEPH P. TUCKER.

### (District Court, E. D. Pennsylvania. November 6, 1908.)

### No. 51.

WHARVES (§ 20*)—GROUNDING OF VESSEL—LIABILITY OF LESSEE OF WHARF.
  Respondent leased the shoreward end of a wharf 300 feet long, on one side of which was a dock or slip 40 to 50 feet wide which he did not lease but used to bring vessels to his part of the wharf. There was sufficient water opposite his portion for vessels to lie safely, but toward the outer end of the dock a bar or shoal extended across it, the most of which was under water at all stages of the tide. Libelant's barge, laden with lumber a part of which was to be discharged at respondent's wharf, in charge of a master who had no knowledge of the locality, relying on the assurance of respondent's agent that there was sufficient water, attempted to enter the slip, and grounded on the shoal and was injured. *Held* that, while respondent was not responsible for the condition of the dock at the place of the shoal, it was his duty to see that vessels approaching his wharf therein were advised of such condition, and that under the facts shown he was liable for the injury.
  [Ed. Note.—For other cases, see Wharves, Cent. Dig. §§ 35–37; Dec. Dig. § 20.*]

In Admiralty. Suit in personam for damages to barge.

George P. Rich, for libelant.

Francis S. Laws and Francis C. Adler, for respondent.

J. B. McPHERSON, District Judge. In August, 1906, the respondent (who is a dealer in lumber) was, and for several years previous had been, one of the lessees of Allison's Wharf, a wharf or pier on the west side of the Schuylkill river in the city of Philadelphia. The structure is 300 feet long, and runs from west to east, beginning at Thirtieth street and projecting into the river. The respondent leased 160 feet of the western end, the remaining 140 feet being occupied by another tenant. On the north side of the wharf, running along its whole length, was a dock or slip, 40 feet wide at Thirtieth street and 50 feet wide at the other end, another wharf bounding the dock on the north. The respondent's lease did not include the dock, but he was permitted to bring vessels into it in order that they might lie alongside his premises and discharge their cargoes in that position. The bottom of the dock was of soft mud, 4 or 5 feet deep, in which all vessels discharging at respondent's wharf were obliged to lie, except at high tide, but where they could lie in safety after they reached his premises. Toward the easterly end of the dock, however, stretching from the part of the wharf that was leased to the other tenant completely across to the wharf on the north side, was an obstructing bar or shoal, which was probably 3 feet wide from east to west at Allison's Wharf and increased in width as it approached the north side of the dock. It was of the same material as the rest of the bottom—soft mud—and it was somewhat higher on the north side of the dock than upon the south side. Its height varied, being from 6 to 8 inches. On the north side of the dock it was exposed at dead low tide for

about 15 feet, but the rest of it was covered at the same stage by a foot and a half or 2 feet of water, and was therefore not visible. The tide ordinarily rises 6 feet in the dock, so that the depth of water at high tide over the shoal for, say, 20 or 25 feet north from Allison's Wharf, was from 7½ to 8 feet. The height of the tide, however, varies with the wind; with an east or northeast wind the depth over the shoal is usually greater, while with a west or southwest wind the depth is usually less, than these measurements. As the shoal or bar lay between the river and respondent's part of the wharf, a vessel was obliged to cross it before she could reach a berth alongside his premises. If she was able to cross, safety was attained; but, if she grounded upon the shoal and could not be promptly pulled off, she was in a dangerous position, because the water deepens rapidly from the shoal eastward, and, as the eastern part of the vessel would thus be without other support than the water, she would be likely, especially if she were loaded, to break or be severely strained.

Under such circumstances, what duty did the respondent owe to vessels that were bound to his wharf upon his invitation? He had no control over the dock, except such as might be involved in the permission to use it, and he certainly was under no obligation to dredge away the shoal. But, knowing as he did that the shoal existed, and knowing also its situation, its approximate dimensions, and its characteristics, he was bound to communicate his knowledge to incoming vessels, so that they might take appropriate precautions against the danger. If he failed to give such notice, or if he gave misleading information, whereby in either case a vessel proceeding in ignorance was induced to attempt the passage under dangerous conditions, he would be liable for such injuries as might be sustained. On the other hand, if he duly informed the vessel of the threatening situation, or if the master knew about it from any other source, but in the face of such notice or knowledge the vessel nevertheless went on and took the risk of a successful crossing, without encouragement or direction from the respondent, the venture would not be his, but would be the vessel's only. I do not understand these rules to be questioned, and it only remains to apply them to the facts disclosed by the testimony.

These facts are as follows: The libelant's barge, the Joseph P. Tucker, loaded with a cargo of lumber, of which part was consigned to the respondent, arrived at the river end of Allison's Wharf on the evening of August 26th. The master of the barge had never been at the wharf before, and knew nothing about the dock or the shoal. The berth alongside the respondent's premises was occupied by another barge, which was then in process of unloading, and the Tucker was obliged to lie at the end of the wharf until the following Thursday morning. During these three days the master was about the wharf for much of the time, and observed so much of the conditions in the dock as were visible at different stages of the tide. He saw the exposed northern part of the shoal at low water, but of course he could not know by mere inspection how deep the water was at that stage of the tide upon the covered southern part. With commendable caution he took soundings from the north side of the wharf, and found suffi-

cient water, both east and west of the shoal, to permit the safe passage of his barge. But, as it happened, there was a large pile of lumber on the wharf, extending to its cap-log, and this pile was directly opposite the shoal, so as to prevent sounding at that point from the wharf, and the consequence was that no sounding was made upon the shoal itself. It is argued that the master should have used a boat when he found that his access to the dock from the wharf was obstructed at this point by the pile of lumber, and that he was negligent in failing to employ this means. I do not agree with this contention; such use of a boat would have been out of the ordinary, and there was nothing, I think, to suggest that so unusual a precaution should be adopted. Certainly there was the less occasion to suspect that unusual care should be taken, if it be true, as I think it is, that the respondent's son—who was his responsible agent in charge of the wharf, and had full knowledge concerning the dock and the shoal—assured the master that there was sufficient water in the dock to permit the barge to go safely to her berth alongside the respondent's premises. The Tucker, which was a large vessel, 168 feet long, was drawing 8 feet aft and 6 feet 7 inches forward, and the respondent's agent was advised of this draft. There is much dispute concerning the information which he gave to the master; it would be profitless to repeat the details of the testimony; but I think the weight of the evidence establishes the fact that he did assure the master that there was sufficient water in the dock to take the Tucker safely to her berth at flood tide. Probably in order to make sure on this point, the respondent's agent decided to unload part of the cargo at the eastern end of the wharf before taking the barge across the shoal. On Thursday, August 30th, therefore, some of the lumber was unloaded at the end of the wharf and hauled to the respondent's premises. After this work had gone on for two hours, the barge that had previously been discharging drew out of the dock, leaving the berth empty. There was a small schooner close by, which was also destined for the dock, and the respondent's agent was anxious that she should not get in ahead of the Tucker. Accordingly he urged the master to hurry, helped him by sending on board of the barge several of his own men, and took part in aiding the movement of the vessel along the north side of the wharf toward the respondent's premises. The unloading that morning had been from the bow, so that while the bow was higher the stern was about 2 inches deeper, and the result of the effort to enter was that the barge stuck fast on the shoal, taking the ground about 95 feet from the stern. At this time the tide was almost, if not quite, flood, but as the wind was unfavorable the rise was probably several inches less than usual. Attempts were immediately made to pull her off, but they were unavailing, as the water speedily began to go down. Efforts to obtain a tug were also fruitless, and it was necessary to leave the vessel where she was until the cargo destined for the respondent was taken off. This required three days, and meanwhile injury was done by the "hogging" to which she was subjected.

The negligence of the respondent's agent seems to me to be clear. He was apparently anxious to save the time and money which would

be expended in lightening the barge to a draft that would be perfectly safe, and hoped that she could be forced through the mud of the shoal for the few feet that offered the chief, if not the only, obstacle to her progress toward a place of safety. Actuated by this motive, he gave information to the master that was slightly, but sufficiently, misleading, and took the risk that the effort to force the boat through would be successful. For his negligence the respondent is liable. I see no negligence on the part of the master. The respondent's theory is that the master had ample notice about the shoal from several sources, and that he and his stevedore took the chance of getting through, moving the barge into the dock during the temporary absence of the respondent's agent, and without his knowledge or approval. In my opinion, this theory has not been established by the evidence, and therefore should not be allowed to influence the decision.

A decree may be entered in favor of the libelant, with costs and a reference to a commissioner.